UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
MSP RECOVERY CLAIMS, SERIES LLC, MSPA
CLAIMS I, LLC, and SERIES PMPI, a
designated series of MAO-MSO RECOVERY
II, LLC,

               Plaintiffs,

      - against –

TAKEDA PHARMACEUTICALS AMERICA,
INC.; TAKEDA PHARMACEUTICALS U.S.A.,
INC., f/k/a TAKEDA PHARMACEUTICALS
NORTH AMERICA, INC.; TAKEDA
DEVELOPMENT CENTER AMERICAS, INC.,
f/k/a TAKEDA GLOBAL RESEARCH &
DEVELOPMENT CENTER, INC.; TAKEDA
PHARMACEUTICALS INTERNATIONAL, INC.;
TAKEDA PHARMACEUTICAL COMPANY LIMITED;
and ELI LILLY & COMPANY,

              Defendants.
------------------------------------X

**MEMORANDUM AND ORDER**

19 Civ. 5610 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    This is our second opinion in this case, which concerns payments made by third-party payors for prescriptions of the Type 2 diabetes drug Actos that was manufactured by Takeda and marketed by both Takeda and Eli Lilly.[1] Defendants now seek to dismiss the Second Amended Complaint ("SAC" (ECF No. 46)), which asserts claims arising under the laws of 25 different jurisdictions based on

---

    [1] Unless otherwise noted, the abbreviations used in this opinion have the same meaning as those used in our August 2020 Memorandum and Order (ECF No. 100 ("Takeda I")).

defendants' alleged concealment of their awareness that taking Actos increases the risk of a patient developing bladder cancer.

<u>**BACKGROUND**</u>

While we assume familiarity with the facts of the case, which were described in <u>Takeda I</u>, we will nevertheless briefly summarize the basic allegations in the Second Amended Complaint and the procedural history of this case.

In 1999, the Food and Drug Administration granted its approval for Actos, a drug developed by Takeda and marketed by defendants, to be used as a prescription medication to treat Type 2 Diabetes. Actos is a thiazolidinedione, a class of medication that primarily targets a patient's gamma peroxisome proliferator-activated receptor ("PPAR") to lower insulin resistance and glucose levels. Unlike some other drugs that were designed to treat Type 2 diabetes, Actos also acted as an alpha PPAR agonist, which provided the peripheral benefit of helping to lower a patient's cholesterol levels.  However, as defendants discovered, Actos's dual activation of alpha and gamma PPAR also increased a patient's risk of developing bladder cancer and other harmful side effects.

Despite knowing about these side effects, defendants marketed Actos as superior to competing diabetic medications that only activated gamma PPAR while failing to reveal that Actos increased the risk of developing serious health issues.  In addition to concealing these risks from the public, defendants also misled the

FDA into believing that studies revealing the harmful side effect risks of Actos were erroneous and failed to update Actos's warning label.

On June 15, 2011, after conducting further analysis on the effects of Actos, the FDA announced that use of Actos for more than a year increased a patient's risk of developing bladder cancer.  Defendants correspondingly updated Actos's warning label. Following the FDA's announcement, Actos prescriptions dropped by 80% and then went generic in August 2012.

Nearly eight years to the day after the FDA's announcement, plaintiffs filed this lawsuit, which concerns payments for Actos prescriptions made by 56 third-party payor organizations located throughout the United States that administer Medicare Parts C and D benefits for Medicare beneficiaries.  Plaintiffs are not themselves the third-party payors; rather, they are limited liability companies that purchased the claims of the 56 organizations (the "Assignors") between December 2014 and March 2018 and essentially serve as litigation vehicles.  Although the Assignors' claims arise from over one hundred thousand of transactions from across the country for individual prescriptions of Actos, plaintiffs decided to collectively assert the claims of those 56 different third-party payors in this action.

In the first iteration of their complaint, filed on June 14, 2019, plaintiffs alleged claims for civil violations of the

Racketeer Influenced and Corrupt Organizations Act ("RICO") alongside various state-law claims for fraud, unjust enrichment, and violations of consumer protection statutes. (ECF No. 1.) Approximately a month later, plaintiffs amended their complaint to withdraw their civil RICO claims for reasons undisclosed to the Court. (ECF No. 4.) On September 23, 2019, plaintiffs filed the operative Second Amended Complaint, which asserted identical causes of action but added allegations clarifying the citizenship of members of each plaintiff LLC. (ECF No. 46.) Finally, in March 2020, plaintiffs filed a motion seeking leave to file a proposed third amended complaint, which attempted to reassert the previously withdrawn civil RICO claims against defendants. (ECF No. 92.)[2]

In Takeda I, we denied plaintiffs' motion to file their third amended complaint as futile, finding that plaintiffs could not state a claim for civil RICO violations under binding Second Circuit precedent. In that opinion, we noted that plaintiffs' decision to structure their case as an individual action despite bundling together the claims of the 56 Assignors appeared to be "specifically designed to circumvent Second Circuit law, which

---

[2]    This proposed amendment appears to have been precipitated by the Ninth Circuit's December 2019 opinion in Painters & Allied Trades District Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd., which reversed the district court's dismissal of civil RICO claims levied against Takeda and Lilly in a putative class action related to Actos pending in the Central District of California. 943 F.3d 1243 (9th Cir. 2019).

clearly precludes litigating a case under the quantity effect theory as a class action." Takeda I at 12 n.2.

Following Takeda I, defendants filed the instant motion to dismiss the operative Second Amended Complaint, which asserts claims for: (1) common-law fraud and negligent misrepresentation; (2) unjust enrichment arising under the laws of 24 states and Puerto Rico; and (3) violations of ten states' consumer protection and unfair and deceptive business practices statutes. Specifically, defendants first move pursuant to Federal Rule of Civil Procedure 12(b)(6) and argue that the Second Amended Complaint should be dismissed because plaintiffs have failed to timely assert their claims arising under New York law or have otherwise failed to adequately plead those claims. Next, pursuant to Federal Rule of Civil Procedure 12(b)(2), defendants argue that the Court lacks personal jurisdiction over them related to plaintiffs' remaining claims and that the Court should decline to exercise pendent personal jurisdiction over defendants related to those claims.[3]

For the reasons below, defendants' motion is granted.

---

[3]     Defendants also argue with respect to the remaining claims that venue is improper in this District and that the Second Amended Complaint fails to state a claim upon which relief can be granted.  However, based on our disposition of those claims on personal jurisdiction grounds, we need not and do not reach those arguments.

## DISCUSSION

### I.   Personal Jurisdiction Over Defendants For New York-Based Claims

Before addressing the jurisdictional issues that are in dispute, we set out the three issues of jurisdiction that are not contested.  First, there is no dispute that the Court cannot exercise general personal jurisdiction over the defendants, who are either domiciled in Delaware, Illinois, and Japan (the Takeda defendants) or domiciled in Indiana (Eli Lilly).  Second, the parties do not dispute that there is no specific personal jurisdiction over defendants for claims related to Actos prescriptions written and filled outside New York and paid for by non-New York Assignors.  Third, the parties agree that the Court may exercise specific personal jurisdiction over the defendants for claims related to Assignors' payments for Actos prescriptions that were written and filled in New York.

In dispute, however, is (1) whether the Court can exercise personal jurisdiction over defendants related to claims for payments for Actos by New York Assignors where the Actos prescriptions were written and filled outside of New York; and (2) whether the Court should exercise pendent personal jurisdiction over the defendants for all remaining claims.  We consider these issues seriatim.

In opposing a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a plaintiff must demonstrate

that the Court has jurisdiction over the defendants with respect to each claim asserted.  See Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 83 (2d Cir. 2018) (citation omitted); see also Penguin Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34-35 (2d Cir. 2010) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.") (citation omitted).  To make this showing, a plaintiff must put forth "'legally sufficient allegations of jurisdiction,' including 'an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'"  Penguin Grp., 609 F.3d at 35 (citation omitted). In assessing whether a plaintiff has met that burden, courts may rely on the allegations in the complaint and affidavits furnished by the parties.  See Jonas v. Est. of Leven, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015).  Additionally, courts must "construe the pleadings and affidavits in plaintiff's favor." PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997).

In resolving questions of personal jurisdiction in a diversity action, as here, "a district court must conduct a two-part inquiry."  Met. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).  "First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws

comports with the requirements of due process." Id. (citation omitted).

With respect to the first part of the inquiry, plaintiffs assert that defendants are subject to personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1), which provides that "a court may exercise personal jurisdiction over any non-domiciliary ... [1] who in person or through an agent ... transacts any business within the state, so long as [2] the plaintiff's cause of action arises from that transaction." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 60 (2d Cir. 2012) (internal quotation marks omitted and alterations incorporated). The first prong of this test is satisfied when an out-of-state defendant engages in acts that demonstrate that it has voluntarily and purposefully availed itself of the privilege of conducting activities in New York, including when it solicits business in New York and establishes a continuing relationship with the forum. See Amorphous v. Morais, No. 17 Civ. 631 (NRB), 2018 WL 1665233, at *4 (S.D.N.Y. Mar. 15, 2018) (citations omitted). The second prong's "arises from" requirement can be met when there is an articulable nexus or substantial relationship between the business transacted and the relevant claim asserted. See id. (citations omitted).

Regarding due process, a court may exercise personal jurisdiction over a defendant for a given claim when (1) the defendant has the requisite "minimum contacts" with the relevant

forum, and (2) exercising personal jurisdiction is reasonable under the circumstances. Id. at *6 (citing Eades v. Kennedy, PC Law Offices, 799 F.3d 161, 168-69 (2d Cir. 2015)).  A defendant has sufficient minimum contacts with a forum when it "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  Eades, 799 F.3d at 169 (citation omitted).  Thus, courts must assess whether there is a sufficiently close link between the defendant, the forum, and the litigation concerning the defendant's activities in the forum. See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1032 (2021).  Finally, "[w]here a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable," Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 129 (2d Cir. 2002) (citation and internal quotations marks omitted), such as undue burden, the interests of judicial efficiency, or other public policy considerations, see Amorphous, 2018 WL 1665233, at *7 (citation omitted).

Applying these standards, we have no difficulty concluding that plaintiffs have made a prima facie showing that there is specific personal jurisdiction over defendants for claims related to payments by New York-based Assignors, regardless of where the prescriptions were ultimately filled.  That is because, according

to the Second Amended Complaint, defendants marketed and distributed Actos nationally, including in New York, and thus voluntarily reached into New York to make representations about Actos that ultimately led to the New York Assignors' decision to reimburse prescriptions of the drug.  The claims here arise from those contacts, and thus defendants could reasonably anticipate being haled into court in New York to answer for claims brought on behalf of Assignors located in New York.  As defendants do not raise compelling policy or burden arguments against exercising personal jurisdiction over them related to these claims, the requirements of N.Y. C.P.L.R. § 302(a)(1) and due process have been met.

Defendants, however, argue that plaintiffs have not established that there are any New York-based Assignors. Plaintiffs, in response, submit in their briefing that the Assignor Group Health Incorporated and Health Insurance Plan of Greater New York ("EHTH") is a resident of New York.  While the Second Amended Complaint glaringly does not allege the state of residence for any of the Assignors, we nevertheless accept plaintiffs' assertion that EHTH, which currently operates as EmblemHealth, Inc.,[4] is a

---

[4] See Our Story, EmblemHealth (last visited Sept. 28, 2021), https://www.emblemhealth.com/about/our-story.

New York resident based on confirmatory public records for which we may take judicial notice.[5]

Accordingly, we find that plaintiffs have made a <u>prima facie</u> showing of specific personal jurisdiction over defendants for both (1) claims related to Actos prescriptions written and filled in New York paid for by any of the 56 Assignors, and (2) claims related to Actos prescription paid for by the New York-based Assignor EHTH.[6]  We will refer to these claims collectively as the "New York Claims."

---

[5]      According to New York Secretary of State records publicly available at https://apps.dos.ny.gov/publicInquiry, EmblemHealth, Inc. is a not-for-profit corporation based in New York, New York.  We may take judicial notice of the information available on the Secretary of State's website because it is readily available and its accuracy "cannot be reasonably questioned."  Fed. R. Evid. 201(b)(2); <u>see</u> <u>J & J Sports Prods., Inc. v. Gomez</u>, 18 Civ. 5199, 2019 WL 4744229, at *5 (E.D.N.Y. Sept. 29, 2019) (taking judicial notice of information on secretary of state website) (listing cases).

[6]      We will apply New York law to both categories of claims.  With respect to the claims for payments made by New York Assignor EHTH, plaintiffs have proceeded as if New York law applies (<u>see</u> Pls.' Opp. Br. (ECF No. 110) at 21) and defendants do not argue for the application of any other jurisdiction's law to those claims.  Accordingly, the parties have impliedly consented to have New York law govern these claims.  <u>See</u> <u>Motorola Credit Corp. v. Uzan</u>, 388 F.3d 39, 61 (2d Cir. 2004).  With respect to the claims for payments made by any Assignor for Actos prescriptions written and fulfilled in New York, defendants brief their arguments under New York law.  (<u>See</u> Defs.' Mot. (ECF No. 106) at 10, 24.)  Plaintiffs do not explicitly assert that the laws of any other jurisdiction should govern any of the specific transactions underlying these claims and, moreover, fail to provide any information in the Second Amended Complaint about where any of the Assignors are domiciled that would allow us to conduct a full choice-of-law analysis.  Accordingly, we will proceed to evaluate these claims under New York law.  <u>See Bravado Int'l Group Merch. Servs. v. Ninna, Inc.</u>, 655 F. Supp. 2d 177, 193 n.14 (E.D.N.Y. 2009) (applying law of the forum when plaintiff has alleged insufficient facts to enable the court to "make a choice of law determination with any certainty").

## II.  **Timeliness of Plaintiffs' New York Claims**

We now turn to defendants' argument that the New York Claims are barred by the applicable statute of limitations.  Plaintiffs do not and cannot dispute defendants' assertion that:

(1) their New York General Business Law ("GBL") §§ 349 and 350 claims are subject to a three-year limitations period that begins accruing at the date of injury;[7]

(2) their New York unjust enrichment claims are subject to a limitations period of no longer than six years from the date of the alleged wrongful act;[8] or

(3) their New York fraud and negligent misrepresentation claims are subject to a limitations period that is the greater of (a) six years from the date when plaintiff was injured by relying on the alleged misrepresentation, or (b) two years

---

[7]    N.Y. C.P.L.R. § 214(2); Gaidon v. Guardian Life Ins. Co. of Am., 96 N.Y.2d 201, 210 (N.Y. 2001); see Gould v. Helen of Troy Ltd., No. 16 Civ. 2033 (GBD), 2017 WL 1319810, at *2 (S.D.N.Y. Mar. 30, 2017) ("Accrual of GBL §§ 349 and 350 claims are not dependent upon any date when discovery of the alleged deceptive practice is said to occur.") (citation and internal quotation marks omitted).

[8]    Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 364 (2d Cir. 2013) (Unjust enrichment claims accrue "upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered.") (citation and internal quotation marks omitted).

While defendants submit that a six-year statute of limitations applies to unjust enrichment claims, there is a split of authority in New York intermediate appellate courts regarding whether unjust enrichment claims are subject to a three-year statute of limitations period or a six-year statute of limitations period under N.Y. C.P.L.R. §§ 213 and 214.  See City of Almaty v. Sater, 503 F. Supp. 3d 51, 64-66 (S.D.N.Y. 2020) (noting that the First Department applies a six-year period when the unjust enrichment claim rests on facts that also support another claim governed by a six-year limitations period regardless of the relief sought whereas the Second Department applies a three-year statute of limitations period whenever the plaintiff seeks monetary relief).  While most courts in this District have applied a three-year statute of limitations period when, as here, the unjust enrichment claim seeks monetary relief, see id., we need not decide whether the three- or six-year limitations period applies here, as defendants only assert that a six-year period governs the unjust enrichment claims.

from when plaintiffs discovered or could with reasonable diligence have discovered their claims.[9]

As relevant to each of these claims, the Second Amended Complaint alleges that the FDA publicly announced on June 15, 2011 that Actos increases a patient's risk of bladder cancer. (SAC ¶ 128.)  This establishes the latest possible accrual date for the statute of limitations based on either the date of injury, which is applicable to all of plaintiffs' New York Claims, or the inquiry notice discovery rule, which is applicable to plaintiffs' New York fraud and negligent misrepresentation claims.  As plaintiffs did not file this action until June 14, 2019, nearly eight years later, plaintiffs do not and cannot dispute that the New York Claims were filed after the statute of limitations period expired.

Plaintiffs, instead, offer two arguments to avoid dismissal of their New York Claims on statute of limitations grounds.  First, they urge us to apply the doctrine of equitable tolling.  Second, they contend that the filing of two class actions related to Actos has tolled their claims under the doctrine delineated in American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), which permits the tolling of the statute of limitations for a class member's individual claims during the pendency of the relevant class action. As defendants have demonstrated that plaintiffs filed their claims

---

[9]   N.Y. C.P.L.R. § 213(8); see In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262 (NRB), 2015 WL 6243526, at *178 (S.D.N.Y. Oct. 20, 2015) ("LIBOR IV").

after the time set forth in the relevant statutes of limitations, the burden shifts to plaintiffs to establish that the limitations period should be tolled or that they are entitled to equitable relief from the statute of limitations.  See Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000); Dist. Att'y of New York Cty. v. Republic of the Philippines, 307 F. Supp. 3d 171, 199 (S.D.N.Y. 2018).

### A.   Equitable Tolling

We can quickly dispose of plaintiffs' equitable tolling arguments.   Under New York law, equitable tolling is an extraordinary remedy that is available only when a plaintiff can demonstrate that it acted diligently and commenced the action "within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." Doe v. Holy See (State of Vatican City), 793 N.Y.S.2d 565, 569 (N.Y. App. Div. 2005) (citations omitted).  Here, plaintiffs waited nearly **eight years** to file this lawsuit after the FDA announced that Actos increased a patient's risk of developing bladder cancer.   Accordingly, plaintiffs cannot establish that they acted diligently or that they commenced the lawsuit within a reasonable time, and thus they are not entitled to have their claims equitably tolled.

### B.   **American Pipe** Tolling

Under the American Pipe doctrine, "the timely filing of a class action tolls the applicable statute of limitations for all

persons encompassed by the class complaint." China Agritech, Inc. v. Resh, 138 S. Ct. 1800, 1804 (2018) (citation omitted).

Here, plaintiffs claim that two class actions filed in California——one in state court and one in federal court——tolled the relevant statutes of limitations for their New York Claims.

### 1.   Cross-Jurisdictional Tolling

The first threshold issue raised by defendants is whether American Pipe can be used to toll a statute of limitations governing a New York Claim when the class action was filed in another jurisdiction.  As we explained in LIBOR IV, we must look to the relevant state-law analog of American Pipe tolling to determine whether the statute of limitations governing the state law claims is tolled by the filing of a class action.  LIBOR IV, 2015 WL 6243526, at *138 (citations omitted).

In a recent opinion published after defendants briefed this issue, the New York Court of Appeals recognized that American Pipe tolling applies cross-jurisdictionally for claims arising under New York law; thus, the New York statute of limitations for a class member's individual claims can be tolled during the pendency of a class action lawsuit even if the class action was filed in another jurisdiction.  Bermudez Chavez v. Occidental Chem. Corp., 35 N.Y.3d 492, 503-06 (N.Y. 2020).

The Court of Appeals does, however, require that the "defendant receive[] fair notice of all claims that might arise

-15-

under New York law" for such tolling to apply.  Id. at 505-06.
While Bermudez Chavez did not address whether the relevant class
action complaint must have asserted identical causes of action as
those now being asserted in the individual action, it expressly
recognized American Pipe and its progeny as persuasive authority.
See id. at 504.  And, as this Court noted in LIBOR IV, Second
Circuit precedent applying American Pipe holds that it is
appropriate to toll a class member's individual claims as long as
they share the same factual predicate as the class action claims,
even if the class action complaint asserted different causes of
action.  LIBOR IV, 2015 WL 6243526, at *147 (citing Cullen v.
Margiotta, 811 F.2d 698, 721 (2d Cir. 1987), overruled on other
grounds, Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483
U.S. 143 (1987)).  Further, as explained in LIBOR IV, the reasoning
underlying this conclusion is that the class action claims put
defendants on notice of the relevant subject matter of the
underlying dispute and the evidence, memories, and witnesses
likely to be implicated.  See id.  That same reasoning should apply
with equal force to the Bermudez Chavez requirement that the
defendant receive "fair notice" of the claims that "might arise
under New York law."  35 N.Y.3d at 505-06.

Accordingly, determining whether plaintiffs can rely on a
class action to toll their claims under the American Pipe doctrine
involves a two-part inquiry.  First, we must first determine

-16-

whether plaintiffs (or, more precisely, their Assignors) were members of the underlying class.  Second, if so, we then must determine whether the class action complaint would give defendants fair notice of the factual predicate for the claims that plaintiffs now assert under New York law.

### 2.  Bernor

We first consider whether plaintiffs can rely on the Bernor v. Takeda Pharmaceuticals America, Inc., 12 Civ. 4856 (C.D. Cal.) ("Bernor") class action for American Pipe tolling.  The Bernor class action was originally filed by three individual plaintiffs in California Superior Court on April 18, 2012 before defendants removed the action to the Central District of California.  (Notice of Removal, Bernor, 12 Civ. 4856 (C.D. Cal. June 4, 2012), ECF No. 1 at 11.)

The Bernor class action asserted a common law unjust enrichment claim as well as claims for violations of California Consumer Legal Remedies Act ("CLRA"), the California Unfair Competition Law ("UCL"), and the California False Advertising Law. (Id. at 27-34.)  The Bernor complaint defined the relevant class as:

> All consumers who have been prescribed and purchased or paid, in part or all, of the purchase price other than for resale of the prescription drug Actos in California since July 1999.

(Id. at 17, ¶ 43.)   In alleging the "well-defined community of interest among the members of the class," the Bernor complaint further asserts that "[p]laintiffs, like all other members of the class, were prescribed and purchased . . . Actos in the State of California."  (Id. at 18, ¶ 45.)

Clearly, plaintiffs do not fall within this class definition. To start, plaintiffs and the Assignors were never prescribed Actos, which is an integral part of the Bernor class definition. Moreover, the Bernor class definition purports to limit itself to "consumers."  In the context of the Bernor complaint, "consumers" invokes a precisely delineated statutory term defined in the CLRA, as evidenced by the fact that the first cause of action is for violations of the CLRA and the complaint expressly asserts that "each member of the proposed class" qualifies as a "consumer[]" within the meaning of Section 1761(d) of the CLRA.  (Id. at 27, ¶ 104 (emphasis added).)   Section 1761(d) of the CLRA, in turn, defines "consumer" in relevant part as "an individual," Cal. Civ. Code § 1761(d), a category that does not include plaintiffs or their Assignors, which are business entities.[10]

---

[10]    Plaintiffs argue that the use of "consumer" in the Bernor class definition is broader than the term "consumer" in the CLRA because California's UCL law permits lawsuits by any "person," which includes corporations.  (Pls.' Opp. Br. (ECF No. 110) at 16-17 (citing Cal. Bus. & Prof. Code §§ 17201, 17203).) However, the Bernor complaint did not use the term "person"——a statutory term defined in both the CLRA and the UCL——to describe the scope of the class. Rather, the complaint used the entirely different statutory term "consumer" in setting the parameters of the relevant class.   We are therefore completely unpersuaded by plaintiffs' efforts to expand the scope of the Bernor class

As plaintiffs do not carry their burden to demonstrate that they fall under the Bernor class, they cannot rely on that class action to toll their claims here.

### 3.  Painters

Plaintiffs next endeavor to rely on the Painters & Allied Trades District Council 82 Health Care Fund v. Takeda Pharmaceutical Co. Ltd., No. 17 Civ. 7223 (C.D. Cal.) ("Painters") class action to benefit from American Pipe tolling.  The Painters class action was initially filed in the Western District of Louisiana on July 23, 2014 and is now pending in the Central District of California.  (Compl., Painters, No. 17 Civ. 7223 (C.D. Cal. July 23, 2014), ECF No. 1.)

As the Painters class action was filed over three years after the FDA's announcement in June 2011, plaintiffs cannot rely on American Pipe to toll their GBL claims, which are subject to a three-year statute of limitations.  Those claims are accordingly dismissed with prejudice as untimely.  Likewise, plaintiffs cannot use the Painters class action to toll their unjust enrichment, fraud, or negligent misrepresentation claims for any transaction that occurred before July 23, 2008, as the applicable statute of limitations for those claims expired before Painters was filed.[11]

---

definition by reference to a statutory term of art that the complaint did not cite or rely on.

[11]    The applicable six-year statute of limitations period that accrued from the date of the injury expired on July 23, 2014 for all transactions before July 23, 2008.  The two-year period for plaintiffs to bring their fraud and

Therefore, these claims are also dismissed with prejudice as untimely.

Turning to whether plaintiffs may use <u>Painters</u> to toll their remaining claims, we first find that plaintiffs do fall within the "National RICO" sub-class defined in the <u>Painters</u> complaint:

> All consumers and entities in the United States of America and its territories, who paid or incurred costs for the drug Actos, for purposes other than resale, between 1999, i.e., when the drug was approved, and the present.  Excluded from the RICO Class are employees of Takeda, including its officers or directors, the Court to which this case is assigned, and those consumers who are presently seeking a personal injury claim arising out of their use of Actos.

(<u>Id.</u> ¶ 176.)  Likewise, we find that the factual predicate underlying the claims asserted in the <u>Painters</u> action, which includes alleged civil RICO violations for wire fraud based on the same misrepresentations alleged here, share a sufficient factual predicate with the claims asserted by plaintiffs for <u>American Pipe</u> tolling to apply.  In reaching this conclusion, we note that the Second Circuit analyzed the exact inverse context in <u>Cullen</u> and applied <u>American Pipe</u> to toll the statute of limitations for RICO claims because a prior class action asserted state law claims premised on the same wrongful conduct.  See 811 F.2d at 721.[12]

---

negligent misrepresentation claims after they can be charged with inquiry notice of defendants' alleged misrepresentations expired on June 15, 2013, two years after the FDA's announcement about Actos's side effects.

[12]    While the <u>Painters</u> class action is still pending in California, we note that plaintiffs filed this lawsuit after the Central District of

Because at least some of plaintiffs' New York unjust enrichment, fraud, and negligent misrepresentation claims are timely based on application of the American Pipe tolling doctrine, we now turn to defendants' Rule 12(b)(6) arguments on the merits of those claims.

### III. New York Unjust Enrichment Claims

To state a claim for unjust enrichment under New York law, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182 (N.Y. 2011) (internal quotations and citations omitted). Here, plaintiffs allege that defendants were unjustly enriched by retaining the payments made by Assignors for Actos prescriptions. (See SAC ¶ 381.)

Defendants' primary argument in support of their motion to dismiss plaintiffs' unjust enrichment claims rests on the grounds that the relationship between the Assignors and the defendant drug manufacturers was too attenuated to support an unjust enrichment

---

California's dismissal of the civil RICO claims asserted on behalf of the sub-class that encompassed the Assignors but before the Ninth Circuit reversed the district court and reinstated those claims. In any event, under Second Circuit precedent, plaintiffs may take advantage of American Pipe tolling even when the relevant class action claims are still pending. See In re WorldCom Sec. Litig., 496 F.3d 245, 256 (2d Cir. 2007).

claim under New York law.  (See Mot. at 32 (citing Sperry v. Crompton Corp., 8 N.Y.3d 204, 216 (N.Y. 2007)).

While Sperry stands for the proposition that the relationship between an end purchaser and the makers of ingredients that went into a product purchased by plaintiff was "too attenuated" to support an unjust enrichment claim, the facts here are meaningfully different.  The unjust enrichment claims in this case are brought on behalf of third-party payors against the ultimate manufacturer of a drug.  In assessing whether third-party payors may disgorge a drug manufacturer's profits under an unjust enrichment theory, recent cases in this District and others interpreting New York law have found that this relationship between the parties was not "too attenuated" in instances where the drug manufacturer "derived an economic benefit" from overcharging third-party payors for their drug as "a direct and proximate result of [d]efendants' unlawful practices."  Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc, No. 15 Civ. 6549 (CM), 2018 WL 7197233, at *64 (S.D.N.Y. Dec. 26, 2018) (listing cases); see also In re Zetia (Ezetimibe) Antitrust Litig., 400 F. Supp. 3d 418, 442 (E.D. Va. 2019); In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig., 64 F. Supp. 3d 665, 709-10 (E.D. Pa. 2014). While those cases were premised on antitrust violations and thus different than the misconduct alleged here, there is an analogous relationship between the parties (drug manufacturer and third-

-22-

party payors) and the relevant injury (defendants profiting from payments made by third-party payors as a result of defendants' alleged misconduct).  Finding the reasoning in the antitrust cases to be persuasive, we conclude that the Second Amended Complaint alleges a sufficiently close relationship between the Assignors and defendants.

However, plaintiffs' unjust enrichment claims ultimately fail on other grounds.  The underlying basis of plaintiffs' unjust enrichment claims is virtually indistinguishable from <u>Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP</u>, 20 F. Supp. 3d 305 (E.D.N.Y. 2014), <u>aff'd</u>, 806 F.3d 71 (2d Cir. 2015), in which third-party payor plaintiffs sought to recover payments made to Sanofi for the antibiotic drug, Ketek, which Sanofi marketed without fully revealing that the drug increased the risk of developing liver issues.  The district court in <u>Sergeants</u> reasoned that plaintiffs' New York unjust enrichment claims should be dismissed as a matter of law:

> [T]his Court finds nothing inequitable or unjust in permitting Defendants to retain profits from sales to Plaintiffs' beneficiaries.  There is no question that Defendants provided Ketek to Plaintiffs' beneficiaries and that Plaintiffs were contractually obligated to pay on behalf of those beneficiaries.  While Defendants may have procured the sales by failing to disclose certain risks and by exaggerating the efficacy of Ketek, there is no evidence that Plaintiffs' beneficiaries suffered any ill-effects or

–23–

found Ketek to be ineffective.  Absent such
evidence, there is no reason why Plaintiffs
should obtain a full refund.  Moreover,
Plaintiffs, who disavow reliance on a price
effect theory, do not allege that they paid
artificially inflated prices for Ketek.

Moreover, even assuming Plaintiffs'
beneficiaries suffered ill-effects or found
Ketek ineffective, it is those beneficiaries
who should be compensated. . . . Plaintiffs are
not bringing a derivative action on behalf of
those beneficiaries.  Plaintiffs themselves
would not suffer any harm unless they paid
extra to treat those ill-effects or to purchase
a second round of antibiotics, and there is no
evidence that they did so.

Id. at 340.  The Second Circuit upheld the dismissal of the unjust

enrichment claims on the opinion below.  Sergeants Benevolent Ass'n

Health & Welfare Fund v. Sanofi-Aventis U.S. LLP, 806 F.3d 71, 98

(2d Cir. 2015).[13]

While Sergeants was a summary judgment opinion, its reasoning

applies with equal force here, where plaintiffs likewise do not

allege that defendants failed to provide Actos to the Assignors'

beneficiaries, that the Assignors had to pay for other anti-

diabetic medication for their beneficiaries because Actos was

ineffective, or that the Assignors had to pay for their

beneficiaries' treatment for any side effects caused by Actos that

---

[13]    As discussed at length in Takeda I, Sergeants also upheld the
dismissal of the third-party payors' civil RICO claims based on the conduct
described in the passage above.

defendants had allegedly concealed.[14]   Moreover, like Sanofi,
plaintiffs do not cast their claims under an excess price theory
or derivatively on behalf of the Assignors' beneficiaries.
Accordingly, we find that plaintiffs do not state an unjust
enrichment claim under New York law for a refund of the Assignors'
payments for their beneficiaries' Actos prescriptions.

## IV.   New York Fraud and Negligent Misrepresentation Claims

Defendants next challenge the sufficiency of plaintiffs'
fraud and negligent misrepresentation claims.   "To state a claim
for fraud under New York law, a plaintiff must allege (1) a
material misrepresentation or omission of fact; (2) which the
defendant knew to be false; (3) which the defendant made with the
intent to defraud; (4) upon which the plaintiff reasonably relied;
and (5) which caused injury to the plaintiff."   Fin. Guar. Ins.
Co. v. Putnam Advisory Co., LLC, 783 F.3d 395, 402 (2d Cir. 2015)
(citation omitted).   The same elements generally apply for a
negligent misrepresentation claim under New York law, except that
scienter must only be proven under a negligence standard.   Carroll
v. LeBoeuf, Lamb, Greene & MacRae, LLP, 623 F. Supp. 2d 504, 510
(S.D.N.Y. 2009) (citations omitted).[15]

---

[14]    Indeed, plaintiffs do not even allege that any of their Assignors'
beneficiaries developed bladder cancer as a direct result of taking Actos.

[15]    Because defendants do not attack the scienter element of plaintiffs'
fraud claim, our analysis below applies equally to both the fraud claim and the
negligent misrepresentation claim.

Defendants argue that the Second Amended Complaint fails to adequately allege the circumstances of the fraud in accordance with Rule 9(b) or plead a cogent theory of causation. Our focus is primarily on the latter argument.

To plead causation and the related element of detrimental reliance under New York law, a plaintiff "must allege both that the defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." Fin. Guar., 783 F.3d at 402 (citation and internal quotation marks omitted). It is therefore "insufficient for a fraud plaintiff to show merely that some chain of events beginning with a false statement by defendants led to his injury." Amusement Indus., Inc. v. Stern, 786 F. Supp. 2d 758, 775 (S.D.N.Y. 2011) (citation omitted).

At the outset of our discussion of plaintiffs' fraud allegations, it is worthwhile reviewing the sequence of events that must occur for the Assignors to pay for Actos. First, as explored in depth in Takeda I, physicians must arrive at an independent clinical judgment to prescribe Actos to treat a patient's Type 2 diabetes. (See SAC ¶ 194.) Second, the patient must be a beneficiary of the Assignor. Third, Actos must be listed on the Assignor's formulary, the list of drugs approved for reimbursement by the Assignor. (Id. ¶¶ 189, 194, 285.) Fourth,

as the Assignors contracted out the creation of their formularies to pharmacy benefit managers ("PBMs"), those PBMs must evaluate and recommend Actos for inclusion on an Assignor's formulary and where it should rank in relative preference to competing drugs, which may factor into a physician's prescription decisions.  (See id. ¶¶ 189-90, 194.)

Here, the predicate for plaintiffs' fraud claims is that: (1) defendants failed to update the Actos warning label to reflect the side effect risks in violation of the Food Drug and Cosmetic Act (id. ¶¶ 56, 112, 118); (2) defendants engaged in a marketing campaign that highlighted the supposed cholesterol benefits of Actos as compared to its immediate competitors but concealed the associated risks of developing serious side effects (id. ¶¶ 72-75, 87); and (3) defendants published three scientific articles that either highlighted the benefits of Actos's cholesterol reducing qualities without discussing the full extent of the deleterious side effects or actively manipulated and concealed the results of a study that demonstrated the increased risk of developing bladder cancer from taking Actos (id. ¶¶ 76, 94, 99-104, 110, 113).[16]

---

[16]     In describing the fraud the Second Amended Complaint also contains myriad allegations about (1) defendants' internal documents and communications, (2) defendants' non-public communications with the FDA about Actos and related studies, (3) defendants' roles in creating and promoting Actos, (4) a whistleblower lawsuit filed by a former Takeda scientist, and (5) actions taken by European regulatory agencies.  (See SAC ¶¶ 58-71, 77-86, 88-98, 105-09, 114-17, 119-27.)  With respect to the first two categories, the Second Amended Complaint does not allege that plaintiffs' Assignors were aware of these non-

According to the Second Amended Complaint, defendants' misrepresentations "fraudulently induced Plaintiffs' Assignors to include Actos in their formularies, which were used as the basis for causing them to pay for Actos" and "Plaintiffs' Assignors would not have paid any amounts of money related to Actos if they had known the truth."  (Id. ¶ 285; see also id. ¶¶ 187, 194, 196 (alleging that plaintiffs relied on the misrepresentations by "includ[ing] Actos on their formularies" and "reimbursing and/or paying for prescriptions of Actos" when they "would instead have paid for safer, equally efficacious drugs like metformin and/or sulfonylureas").)  Put simply, plaintiffs' causation theory is that the Assignors would never have placed Actos on the list of drugs they would be willing to reimburse, but for, and as a direct result of, defendants' misrepresentations.

While that would otherwise be a plausible theory of causation, it is entirely undermined by Exhibit D to the Second Amended Complaint, which reflects that the Assignors paid for what appears to be **tens of thousands** of Actos prescriptions between 2012 and 2017.  That is, after the public learned about the harmful side effects of Actos that had been allegedly concealed by defendants, the Assignors nevertheless continued paying for Actos

---

public communications or otherwise relied on them to their detriment and thus these statements cannot serve as a predicate for the fraud claims.  The remaining categories are merely descriptive of the circumstances surrounding the alleged fraud and do not purport to identify any specific statement or omission attributable to defendants upon which plaintiffs' Assignors relied.

prescriptions for over half a decade, meaning that they never took steps to remove Actos from their formularies.  This, of course, is incompatible with the Second Amended Complaint's theory that the Assignors "would not have paid any amounts of money related to Actos if they had known the truth."  (SAC ¶ 285.)[17]

To the extent that plaintiffs claim that they would have paid for fewer prescriptions of Actos had defendants not deceived doctors into prescribing Actos when they otherwise would not have, we find that the Second Amended Complaint does not state a claim for fraud under this theory for at least two reasons.

First, plaintiffs may not rely on a generalized "fraud on the market" theory to establish reliance for common law fraud.  See LIBOR IV, 2015 WL 6243526, at *65 ("[T]he common law does not generally recognize a 'fraud on the market' theory of reliance."). Thus, at the very least, plaintiffs would have to identify an instance in which a particular doctor relied on defendants' alleged misrepresentations to write a prescription for Actos that an

---

[17]     Citing to In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig., 804 F.3d 633, 634 (3d Cir. 2015), plaintiffs argue that the Assignors' continued payments for Actos after the FDA's announcement in 2011 is not fatal to their theory of causation.  While we recognize that Avandia rejected an argument similar to what defendants raise here because it required the court to "assume, in the absence of contrary allegations, that [third-party payors] did not change their coverage of [a drug] in 2007" when the risk factors about that drug were publicly disclosed, id. at 644, that is not the case here.  Here, the only reasonable assumption to be drawn from Exhibit D to the Second Amended Complaint is that the Assignors did not change their coverage of Actos on their formularies, as the list of transactions set forth in Exhibit D demonstrates that the Assignors continued to reimburse prescriptions of Actos for well over six years after the FDA announced the health risks associated with the drug.

Assignor reimbursed.  However, the Second Amended Complaint does not even attempt to do so and thus it plainly cannot satisfy Rule 9(b)'s requirement to plead the circumstances of the fraud with specificity.

Second, even if the Second Amended Complaint did identify specific instances in which a doctor detrimentally relied on the alleged misrepresentations to take some action that he or she otherwise would not have, plaintiffs would still not be able to state a claim because New York does not recognize fraud claims based on reliance by third parties rather than the plaintiff (or, here, the Assignors).  Pasternack v. Lab'y Corp. of Am. Holdings, 27 N.Y.3d 817, 829 (N.Y. 2016).  Consequently, plaintiffs' fraud claims must be premised on the Assignors themselves taking some action in detrimental reliance on the alleged misrepresentations and not third parties.  See id. ("[T]he tort of fraud is intended to protect a party from being induced to act or refrain from acting based on false representations——a situation which does not occur where, as here, the misrepresentations were not . . . relied on[] by plaintiff.").  However, as discussed above, the Second Amended Complaint fails to plausibly establish that the Assignors acted to their detriment with respect to the one part of the reimbursement chain that they controlled——the decision to include Actos as an approved drug for reimbursement on their formularies——because the Assignors continued to keep Actos on their formularies and

reimburse Actos prescriptions for well over six years after the truth about Actos's side effects became public.[18]

Accordingly, we find that plaintiffs have failed to state a claim for common law fraud and negligent misrepresentation under New York law.

## V.   Pendent Personal Jurisdiction Over Defendants Related to the Remaining Claims

As discussed above, plaintiffs do not dispute that the Court lacks specific personal jurisdiction over defendants for their remaining claims, which arise under the laws of two dozen other jurisdictions and have no nexus whatsoever to this forum because they exclusively involve over a hundred thousand transactions for Actos prescriptions that were written and filled in other states and paid for by Assignors located outside of New York.  Plaintiffs nevertheless ask the Court to assert personal jurisdiction over the defendants for these remaining claims under the discretionary doctrine of pendent personal jurisdiction.

As an initial matter, we note that plaintiffs are asking for an extraordinary application of the pendent personal jurisdiction doctrine due to the manner in which they have structured this litigation.  This lawsuit is, in many ways, an action brought on behalf of a class of the 56 Assignors.  Plaintiffs are three

---

[18]     To the extent that the Assignors base their claims on defendants' alleged actions to defraud the FDA, such claims fail for substantially the same reasons discussed above and thus we do not reach the parties' arguments regarding whether such claims are preempted by federal law.

entities that represent the interests of 56 different third-party payors that have claims related to payments for Actos prescriptions that present common questions of law and fact.  But, because they acquired these disparate claims, plaintiffs purport to advance the claims of all 56 organizations in this single lawsuit only on their own behalf.  Plaintiffs appear to have taken advantage of this structure in an effort to circumvent the negative litigation consequences of this case being treated as a Rule 23 class action. As noted in Takeda I, plaintiffs attempted to use this distinction to avoid application of Second Circuit precedent from class action cases to plaintiffs' civil RICO claims.  This distinction is also critical to plaintiffs' American Pipe tolling arguments, as that doctrine cannot be used to toll class action claims.  See China Agritech, 138 S. Ct. at 1811.  However, as a consequence of their litigation strategy of trying to fit a square peg into a round hole, plaintiffs are forced to rely on mechanisms like pendent personal jurisdiction to join the claims of the 56 different Assignors together to sue in this forum.

While the Second Circuit has recognized that the discretionary doctrine of pendent personal jurisdiction would allow the Court to exercise jurisdiction over a defendant for claims that are sufficiently related to a New York anchor claim for which the Court has personal jurisdiction over that defendant, see Hanly v. Powell Goldstein, L.L.P., 290 F. App'x 435, 438 (2d

Cir. 2008) (summary order), we harbor serious doubts that the doctrine can or should be applied in the circumstances of this case where the New York claims are so thoroughly dwarfed by the remaining claims. However, our ultimate decision does not rest on that reasoning. That is because, as discussed above, we have dismissed all of plaintiffs' New York anchor claims and thus there is no basis to assert pendent personal jurisdiction over the defendants for the remaining claims. See Olin Corp. v. Fisons PLC, 47 F. Supp. 2d 151, 155 (D. Mass. 1999); 4A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1069.7 (4th ed.) ("Of course, if the only jurisdictionally sufficient claim is dropped or dismissed, particularly if that occurs early in the litigation, the pendent claim should be dismissed as well.").

In lieu of dismissal, plaintiffs urge the Court to instead transfer these claims to the Central District of California, where the Painters class action is pending, or to the Northern District of Illinois where plaintiffs claim that general personal jurisdiction can be exercised over the Takeda defendants. Defendants object to the transfer request.

Under 28 U.S.C. § 1404(a), "a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented" when it serves the "interests of justice." The decision "[w]hether to dismiss or transfer an action lies within

-33-

the sound discretion of the district court." Maple Leaf Foods v.
Ultra Green Energy Servs., No. 14 Civ. 267 (SAS), 2014 WL 2998528,
at *2 (S.D.N.Y. July 3, 2014) (citation omitted).  Moreover, in
considering plaintiffs' request for a transfer, we note that "a
motion to transfer venue is not ordinarily granted at the request
of the party who chose the forum in the first place." Ferrostaal,
Inc. v. M/V EAGLE, No. 02 Civ. 1887 (NRB), 2003 WL 21496689, at *2
(S.D.N.Y. June 30, 2003) (citation omitted).  As plaintiffs
"already had an opportunity to choose the venue when filing the
action," they "must demonstrate, inter alia, that after the action
was filed there was a change of circumstances that warrants
transferring the action to the transferee forum." Id. (citation
omitted).

Here, the only change in circumstance identified by
plaintiffs is that the Court denied leave for plaintiffs to file
a third amended complaint in this action to once again assert
federal RICO claims that plaintiffs had alleged in their original
complaint but then withdrew in their first and second amended
complaints. (Compare ECF No. 1, with ECF Nos. 4, 46.)  Given that
plaintiffs voluntarily decided to withdraw those claims from the
operative Second Amended Complaint and proceed only with state law
claims, it was eminently foreseeable that they might well have
difficulty establishing personal jurisdiction over the defendants
for claims other than the New York Claims.  Therefore, we find

that our decision denying leave to amend to re-add the RICO claims is not the type of changed circumstance that would warrant granting plaintiffs' request to transfer the case from the forum they originally selected.

Finally, while plaintiffs maintain that dismissal may harm their ability to reassert their claims in a timely manner in a newly filed action, such arguments ring hollow after plaintiffs waited eight years to press their claims in the first place and do not identify any relevant statute of limitations with a limitations period of over eight years that expired during the pendency of this action.

Accordingly, we will exercise our discretion to dismiss plaintiffs' remaining claims without prejudice for lack of personal jurisdiction instead of transferring them.

<u>**CONCLUSION**</u>

For the foregoing reasons, plaintiffs' New York Claims are dismissed with prejudice.  Plaintiffs' remaining claims are dismissed without prejudice for lack of personal jurisdiction.

The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 105 and to close the case.

**SO ORDERED.**

Dated:    New York, New York
          September 29, 2021

                              _____
                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE